No. 24-1108

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

INDIAN PEAK PROPERTIES, LLC,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

|  |  |
|---|---|
|  | P. Michele Ellison<br>    *General Counsel* |
|  | Jacob M. Lewis<br>    *Deputy General Counsel* |
|  | Sarah E. Citrin<br>    *Deputy Associate General Counsel* |
| Jonathan S. Kanter<br>    *Assistant Attorney General* | John R. Grimm<br>    *Counsel* |
| Robert B. Nicholson<br>Matthew A. Waring<br>    *Attorneys* | FEDERAL COMMUNICATIONS<br>    COMMISSION |
| U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Ave. NW<br>Washington, DC 20530 | 45 L Street NE<br>Washington, DC 20554<br>(202) 418-1740<br>fcclitigation@fcc.gov |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**(A) Parties and Amici.** All parties listed in the Brief for Petitioner Indian Peak Properties, LLC.

**(B) Rulings Under Review.** The petition for review challenges the following order of the Federal Communications Commission: Order on Review, *Indian Peak Properties, LLC Petitions for Declaratory Ruling Seeking Preemption Under the Rule Governing Over-the-Air Reception Devices*, FCC 24-25 (Mar. 7, 2024) (JA___).

**(C) Related Cases.** The order under review has not previously been before this or any other Court.

On August 18, 2023, Indian Peak filed a Petition for Review in this Court before the order under review had been issued. (Case No. 23-1223.) The Court dismissed the petition as incurably premature. Order, *Indian Peak Properties, LLC v. FCC*, No. 23-1223 (Dec. 7, 2023).

Previously, on June 3, 2022, Indian Peak filed a Petition for Writ of Mandamus in this Court, requesting that the FCC be required to respond to the petitions for declaratory ruling that are the subject of the order under review. (Case No. 22-1098). After the FCC's Wireless Telecommunications and Media Bureaus dismissed the petitions for

declaratory ruling, the Court dismissed the petition for mandamus as moot. Order, *In re Indian Peak Properties, LLC*, No. 22-1098 (Sept. 2, 2022).

Respondents are aware of no other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

**TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ....................................................i

TABLE OF AUTHORITIES ........................................ v

GLOSSARY ............................................................ ix

INTRODUCTION.................................................... 1

JURISDICTIONAL STATEMENT ........................... 2

STATEMENT OF THE ISSUES ................................ 2

PERTINENT STATUTES AND REGULATIONS ...................................... 3

STATEMENT OF THE CASE.................................... 3

I.     STATUTORY AND REGULATORY BACKGROUND. ................................... 3

       A.     The Evolution of the Rule. ........................................ 4

       B.     The Rule's Dispute Provisions. ................................... 7

II.    FACTUAL BACKGROUND AND PROCEEDINGS BELOW. .......................... 8

       A.     Indian Peak's Antenna Use. ...................................... 9

       B.     The California Litigation. ....................................... 11

       C.     Indian Peak Seeks FCC Relief. ................................. 13

       D.     The *Order* Under Review........................................ 15

STANDARD OF REVIEW.................................... 18

SUMMARY OF THE ARGUMENT .......................... 19

ARGUMENT ......................................................... 20

I.     THE *ORDER* WAS LAWFUL................................................. 20

A.  The Commission Correctly Held That the Rule Requires a Human Presence at an Antenna's Location. ......................... 21

B.  Substantial Evidence Supports the Commission's Ruling. ...... 27

II.  THE COMMISSION CORRECTLY REJECTED INDIAN PEAK'S ARGUMENTS THAT THE BUREAUS' FAILURE TO INITIATE A PROCEEDING WAS IMPROPER. ........................................... 29

A.  The Bureaus Reasonably Dismissed Indian Peak's Petitions Without Initiating a Proceeding. ............................. 30

B.  The Commission Did Not Violate Indian Peak's Due Process Rights or Reliance Interests. ...................................... 33

III.  INDIAN PEAK'S NOTICE-AND-COMMENT ARGUMENT IS UNPRESERVED AND WITHOUT MERIT. .................................... 38

A.  Indian Peak Failed to Preserve its Notice-and-Comment Challenge. ................................................................... 38

B.  The Commission Was Not Required to Submit the *Order* to Notice-and-Comment Rulemaking. ..................................... 39

CONCLUSION ........................................................................ 42

CERTIFICATE OF COMPLIANCE .......................................... 43

# TABLE OF AUTHORITIES*

**Cases**

*Archer W. Contractors, LLC v. U.S. Dep't of Transp.*,
  45 F.4th 1 (D.C. Cir. 2022) ..................................................... 19

*Battineni v. Mayorkas*, No. 22-1332 (PLF),
  --- F. Supp. 3d ---, 2024 WL 4367522 (D.D.C. Oct. 2, 2024) ................... 25

\* *Blanca Tel. Co. v. FCC*,
  743 F.3d 860 (D.C. Cir. 2014) ................................................ 39

*Board of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972) ......................................................... 34

*Cassell v. FCC*,
  154 F.3d 478 (D.C. Cir. 1998) ............................................... 39

*Cellco P'ship v. FCC*,
  357 F.3d 88 (D.C. Cir. 2004) ................................................ 18

*Children's Health Defense v. FCC*,
  25 F.4th 1045 (D.C. Cir. 2022) ............................................... 7

*Cinderella Career and Finishing Schools, Inc. v. FTC*,
  425 F.2d 583 (D.C. Cir. 1970) ........................................... 35, 36

\* *Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709
  F.2d 1521 (D.C. Cir. 1983) (en banc) .................................... 34, 35

*Dupree v. Jefferson*,
  666 F.2d 606 (D.C. Cir. 1981) ............................................... 12

*Electric Energy, Inc. v. EPA*,
  106 F.4th 31 (D.C. Cir. 2024) ............................................... 39

*Globalstar, Inc. v. FCC*,
  564 F.3d 476 (D.C. Cir. 2009) ............................................... 39

---

\* *Authorities upon which we chiefly rely are marked with asterisks.*

(v)

# TABLE OF AUTHORITIES
## (continued)

Page(s)

\*      *In re Core Communications, Inc.,*
     455 F.3d 267 (D.C. Cir. 2006) .............................................. 38

*In re Grand Jury Subpoena,*
     912 F.3d 623 (D.C. Cir. 2019) .............................................. 30

*Indian Peak Props. LLC v. FCC,*
     No. 23-1223, 2023 WL 8494465 (D.C. Cir. Dec. 7, 2023) (per curiam).. 30

*Indian River Cnty., Fla. v. U.S. Dep't of Transp.,*
     945 F.3d 515 (D.C. Cir. 2019) .............................................. 27

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.,*
     71 F.4th 1028 (D.C. Cir. 2023) ............................................ 40

*Kisor v. Wilkie,*
     588 U.S. 558 (2019) ....................................................... 24

*Loper Bright Enterprises v. Raimondo,*
     144 S. Ct. 2244 (2024) .................................................... 24

\*      *Nat'l Lifeline Ass'n v. FCC,*
     983 F.3d 498 (D.C. Cir. 2020) .................................... 19, 24, 39

*Neustar, Inc. v. FCC,*
     857 F.3d 886 (D.C. Cir. 2017) .............................................. 40

*NLRB v. Bell Aerospace Co.,*
     416 U.S. 267 (1974) ....................................................... 40

*NTCH, Inc. v. FCC,*
     877 F.3d 408 (D.C. Cir. 2017) .............................................. 30

*Preiser v. Newkirk,*
     422 U.S. 395 (1975) ....................................................... 30

*United States Telecom Ass'n v. FCC,*
     825 F.3d 674 (D.C. Cir. 2016) .............................................. 41

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Waterkeeper Alliance v. EPA,*
   853 F.3d 527 (D.C. Cir. 2017) ................................ 32

*Zevallos v. Obama,*
   793 F.3d 106 (D.C. Cir. 2015) ............................... 33

**Statutes**

5 U.S.C. § 706 ................................................................. 41

28 U.S.C. § 2342 ......................................................... 2, 30

47 U.S.C. § 154 ......................................................... 32, 33

47 U.S.C. § 402 ........................................................... 2, 30

47 U.S.C. § 405 ............................................................... 38

\* Telecommunications Act of 1996, Pub. L. 104-104,
   110 Stat. 56 (1996) ....................................................... 4

**Regulations**

\* 47 C.F.R. § 1.115 ................................................... 18, 33

\* 47 C.F.R. § 1.4000 ...................... 3, 4, 7, 8, 13, 21, 28, 32, 36

**Administrative Materials**

\* *Continental Airlines,*
   21 FCC Rcd 13,201 (2006) ....................................... 25, 26

*Pet'n for Decl. Ruling—Multifamily Broadband Council,* Letter Order,
   32 FCC Rcd 3794 (MB 2017) ....................................... 32

\* *Preemption of Local Zoning Regulation,*
   11 FCC Rcd 19,276 (1996) ......................................... 5, 23

\* *Promotion of Competitive Networks in Local Telecommunications Markets*,
15 FCC Rcd 22,983 (2000) ............................................................. 5, 23, 24

\* *Promotion of Competitive Networks in Local Telecommunications Markets*,
19 FCC Rcd 5637 (2004) ............................................................... 6, 23, 24

\* *Updating the Commission's Rule for Over-the-Air Reception Devices*,
36 FCC Rcd 537 (2021) .......................................................... 4, 6, 7, 23, 24

*Victor Frankfurt, Vernon Hills, Illinois*,
12 FCC Rcd 17,631 (CSB 1997) ............................................................ 36

**Other Materials**

Newton's Telecom Dictionary (32d ed. 2021) ................................................ 5

Order Denying Mot. for Prelim. Inj., *Indian Peak Props., LLC v. City of Rancho Palos Verdes*, No. 20-cv-457 (C.D. Cal. Jul. 15, 2020) (ECF No. 56) ............................................................................... 13

Pet'n for Writ of Mandamus, *In re Indian Peak Props., LLC*, No. 22-1098 (D.C. Cir. Jun. 3, 2022 ) ECF No. 1949651 ....................... 14

**GLOSSARY**

APA                    Administrative Procedure Act

OTARD              Over-the-Air Reception Device

No. 24-1108

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

INDIAN PEAK PROPERTIES, LLC,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

*Respondents*.

On Petition for Review of an Order of
the Federal Communications Commission

## BRIEF FOR RESPONDENTS

## INTRODUCTION

For the past decade, Petitioner Indian Peak Properties, LLC ("Indian Peak") has been in a dispute with the City of Rancho Palos Verdes, California (the "City") over Indian Peak's operation of communications antennas on the roof of a single-family home (the "Property"). The City made Indian Peak remove the antennas, but Indian Peak believes federal law should have allowed it to keep them up. After several courts ruled against it, Indian Peak petitioned Respondent

Federal Communications Commission (the "FCC" or the "Commission") for a declaration that FCC regulations barred the City's enforcement efforts. FCC staff dismissed Indian Peak's petitions. The full Commission upheld that decision, finding that Indian Peak had not sufficiently alleged a regular human presence at the Property, as FCC regulations require. *Indian Peak Props., LLC*, Order on Review, FCC 24-25 (Mar. 7, 2024) (the "*Order*"). Indian Peak now asks this Court to set aside that decision.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a). The Commission issued the *Order* on March 7, 2024, and Indian Peak filed a timely petition for review on May 5, 2024.

## STATEMENT OF THE ISSUES

1. Did the FCC correctly hold that its regulation for over-the-air reception devices applies only to antennas that serve an on-site human user, and did it correctly find that Indian Peak failed to adequately plead facts demonstrating that its antennas satisfied this requirement?

2. Where Indian Peak failed to make a threshold showing that its dispute with the City implicated FCC regulations, did the Commission

properly affirm the staff-level dismissal of Indian Peak's Petitions for Declaratory Ruling without opening a proceeding?

3.   Was the *Order* the product of an adjudication, and thus not subject to notice-and-comment procedures?

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the statutory addendum bound with this brief.

## STATEMENT OF THE CASE

### I.   STATUTORY AND REGULATORY BACKGROUND.

This case concerns the FCC's rule governing over-the-air reception devices ("OTARDs"). The OTARD rule (the "Rule") is designed to promote individuals' access to certain video and wireless services by preempting "state or local law[s] or regulation[s], including zoning, land-use, or building regulations," that interfere with the installation and use of antennas that deliver those services. 47 C.F.R. § 1.4000(a)(1).

For the Rule to apply, an antenna must "transmit or receive" certain video programming or "fixed wireless signals," which are "commercial non-broadcast communications signals transmitted via wireless technology to and/or from a fixed customer location"—for purposes of this case, this essentially means, wireless Internet. 47 C.F.R.

§ 1.4000(a)(1)(i)(A), (a)(1)(ii)(A). *See generally Updating the Commission's Rule for Over-the-Air Reception Devices* ("*2021 Order*"), 36 FCC Rcd 537, 541, ¶ 11 (2021). In addition, an antenna must be "on property within the exclusive use or control of the antenna user where the user has a direct or indirect ownership or leasehold interest in the property[.]" 47 C.F.R. § 1.4000(a)(1).

The FCC has occasionally updated the Rule to account for technological and market changes, but it has retained the Rule's core function as a protection of end users' access to video and wireless services.

**A.     The Evolution of the Rule.**

In the Telecommunications Act of 1996, Congress instructed the FCC "to prohibit restrictions that impair a viewer's ability to receive video programming services through devices designed for over-the-air reception of television broadcast signals, multichannel multipoint distribution service, or direct broadcast satellite services." Pub. L. 104-104 § 207, 110 Stat. 114. At the time, "[t]he record" was "replete with examples of various requirements imposed on those who wish to install . . . dishes or . . . antennas on their property." *Preemption of Local Zoning*

*Regulation* ("*1996 Order*"), 11 FCC Rcd 19,276, 19,286, ¶ 16 (1996). Thus, as originally promulgated, the Rule applied only to video services.

In 2000, the Commission expanded the Rule to include "customer-end antennas" used for fixed wireless services. *Promotion of Competitive Networks in Local Telecommunications Markets* ("*2000 Order*"), 15 FCC Rcd 22,983, 23,028, ¶ 99 (2000). It made this change because "the same antennas may be used for video services, telecommunications, and internet access[.]" *Id.* at 23,027, ¶ 98. At the same time, the Commission "ma[d]e clear that the [Rule's] protection . . . applies only to antennas at the customer end of a wireless transmission, *i.e.*, to antennas placed at a customer location for the purpose of providing fixed wireless service . . . to one or more customers at that location." *Id.* at 23,028, ¶ 99.

The Commission amended the Rule again in 2004, to address a specific scenario: a "network configuration[] . . . in which customer-end equipment" both performs as a "customer-end antenna" and "also relay[s] signals to other customers," which is typical in so-called "mesh networks."[1] *Promotion of Competitive Networks in Local*

---

[1] In a "mesh" network, "each node has a dedicated connection to all other nodes." *Mesh*, Newton's Telecom Dictionary (32d ed. 2021).

*Telecommunications Markets* ("*2004 Order*"), 19 FCC Rcd 5637, 5643, 5644, ¶¶ 16, 17, 17 n.42 (2004). Under this revision, the Rule would no longer exclude an antenna just because it could transmit as well as receive; but the Rule would not apply to "installations that are designed primarily for use as hubs for distribution of service." *Id.* at 5644, ¶ 17 n.42. And the Commission cautioned that "we do not intend that carriers may simply locate their hub-sites on the premises of a customer in order to avoid compliance with a legitimate zoning regulation." *Id.* at 5644, ¶ 17. "Rather, in order to invoke the protections of the OTARD rule, the equipment *must be installed in order to serve the customer on such premises . . . .*" *Id.* (emphasis in original).

Most recently, in 2021, the Commission opened the Rule "to all hub and relay antennas that are used for the distribution of fixed wireless services to multiple customer locations, regardless of whether they are 'primarily' used for this purpose[.]" *2021 Order*, 36 FCC Rcd at 540, ¶ 9. The Commission stressed that this revision was "narrow in scope," and that "the other existing OTARD restrictions" remained in place. *Id.* at 546, ¶ 19. Significantly, an antenna must still "serve[] a customer on whose premises it is located," the Rule still applies "only to antennas

placed in areas where the antennas' user has exclusive use or control," and "the new rule would not apply to the placement of hub and relay antennas on a building or rooftop unless the building owner is a customer of the provider, or unless a customer other than the building owner already has a leasehold right to the rooftop space . . . ." *Id.* at 540–41, 547 ¶¶ 9, 19, 20. *See generally Children's Health Defense v. FCC*, 25 F.4th 1045 (D.C. Cir. 2022) (upholding *2021 Order* on review).

## B. The Rule's Dispute Provisions.

A party may "petition the Commission for a declaratory ruling under § 1.2 of [the Commission's rules], or a court of competent jurisdiction, to determine whether a particular restriction is permissible or prohibited" under the Rule. 47 C.F.R. § 1.4000(e). Petitions "will be put on public notice," *id.*, and "[i]n any proceeding regarding the scope or interpretation" of the Rule, "the burden of demonstrating that a particular . . . restriction complies with this section . . . shall be on the party that seeks to impose or maintain the restriction[.]" *Id.* § 1.4000(g). "[I]f a proceeding is initiated," "the entity seeking to enforce the antenna restrictions . . . must suspend all enforcement efforts pending completion

of review," unless the restriction being enforced pertains to public safety or historic preservation. *Id.* § 1.4000(a)(4).

## II.   FACTUAL BACKGROUND AND PROCEEDINGS BELOW.

Indian Peak is a Nevada limited liability company doing business in California. *See* First Am. Compl. ¶ 10, *Indian Peak Props. LLC et al. v. City of Rancho Palos Verdes et al.*, No. 20-cv-00457 (C.D. Cal. Mar. 5, 2020) (the "C.D. Cal. Compl."), attached as Exhibit H to the City's Response to Indian Peak's Letter of May 5, 2022 (JA___). Either Indian Peak, or its principal and predecessor in interest James A. Kay, Jr. (Br. 3), owns a single-family home (the "Property") in the City. *E.g.*, Pet'n for Decl. Ruling 2 ("Pet'n 2") ¶ 1 (JA___). Indian Peak leases the Property to "FCC licensee Comm Enterprises LLC"—which is operated by Kay, *see* Indian Peak Req. for Expedited Action (May 26, 2022) (the "May 2022 Supplement") at 3 (JA___)—and "Fisher Wireless, LLC[.]" Indian Peak Req. for Expedited Action (Jul. 5, 2022) at 2 (the "July 2022 Request") (JA___). A "'hobby room' . . . attached to the house but accessible only by two outside steel doors" "serves as an equipment room," and is "divided in two by a chain link fence, with half used by Comm Enterprises and half by Fisher Wireless." *Id.* at 2 (JA___).

### A. Indian Peak's Antenna Use.

In 2002, the City granted Kay a "conditional use permit" (the "Permit") allowing him to install five antennas on the roof of the Property. C.D. Cal. Compl. ¶ 21 (JA___). It remains unclear exactly how Indian Peak used these antennas: The Commission found that Indian Peak had offered a "piecemeal, ever-evolving characterization of the facts[.]" *Order* ¶ 24 (JA___). Still, it appears the antennas provided "fixed wireless high-speed Internet access[.]" July 2022 Request at 3 (JA___).

According to Indian Peak, "[w]hen Fisher Wireless or Comm Enterprises staff are working from the house, uninterrupted Internet access allows them to monitor and check the status of their other stations." *Id.* at 4 (JA___). The antennas also "provide[] connectivity for a number of vendors and contractors who visit the Property on a regular basis, and for any residential tenants who lease rooms in the house from time to time." Pet'n 2 at 6 (JA___). Indian Peak later clarified, however, that the Property "currently is entirely a communications site," and "no one" lives there. May 2022 Supplement at 3 (JA___); July Request at 2 (JA___). "[A]part from allowing Petitioner's business operations to function," Indian Peak said its antennas were "necessary to individually

and collectively provide back-up redundancy for performance of an array of vital functions at the Property, including but not limited to providing television and telephone service, security alarm and camera operations, temperature control, and other monitoring functions[.]" Pet'n 2 at 9 (JA___).

Indian Peak placed special emphasis on the *remote* services its antennas facilitated, including "remote security monitoring of the house and grounds," "remotely troubleshoot[ing] and mitigat[ing] network service problems," "remote monitoring and control of the equipment in the house," and "remote monitoring of power supply, HVAC and operational status of the transmitters and other communications equipment, as well as remote[] control[] [of] the same." July Request at 4 (JA___). Indeed, it said that "uninterrupted Internet access is perhaps even more important" "[w]hen there is no one working at the house." July Request at 4 (JA___).

In this Court, Indian Peak alleges for the first time that "[t]he residential portion of the Property is leased to a tenant and has been since April 1, 2023." (Br. 41–42; *see also* Br. 4.) But Indian Peak never

made this claim below, and it acknowledges that no one lived at the Property while this matter was before the Commission. (Br. 4, 42.)

## B. The California Litigation.

In 2014, the City received a complaint about the number of commercial antennas on the roof at the Property. *City of Rancho Palos Verdes v. Indian Peak Props., LLC*, No. B303638, 2021 WL 5316348, at *2 (Cal. Ct. App. Nov. 16, 2021) (JA___). After an inspection revealed at least eleven antennas, plus other equipment, on the roof, the City ordered Indian Peak to remove all but five antennas, and the parties began several years of discussions. *Id.* (JA___); C.D. Cal. Compl. ¶ 27 (JA___). In 2018, the City revoked the Permit and brought a nuisance action in Los Angeles County Superior Court to compel Indian Peak to remove its antennas. *Rancho Palos Verdes*, 2021 WL 5316348, at *3 (JA___); C.D. Cal. Compl. ¶ 27 (JA___). Indian Peak responded with its own lawsuit, challenging the City's decision to revoke the Permit, and seeking to set aside the City's nuisance action. *Indian Peak Props., LLC v. City of Rancho Palos Verdes*, No. B303325, 2021 WL 5316457, at *5 (Cal. Ct. App. Nov. 16, 2021) (JA__). The Superior Court ruled for the City in both cases. The California Court of Appeal affirmed on two of the City's three

claims, and also held that Indian Peak "presented no evidence" that its antennas were covered by the Rule. *See id.* at *6, *11; *Rancho Palos Verdes*, 2021 WL 5316348, at *6, * 13, *15 (JA___).

In 2020, Indian Peak sued the City again—this time under 42 U.S.C. § 1983 in the U.S. District Court for the Central District of California—alleging that its antennas "were OTARD antenna[s] and thus exempt from regulation." C.D. Cal. Compl. ¶ 91 (JA___). Indian Peak unsuccessfully sought a preliminary injunction ordering the City not to remove its antennas. *See* City's Resp. to Indian Peak Letter of May 5, 2022 (May 6, 2022) (the "May 2022 City Letter") at 2 (JA___). In denying that request, the court remarked that "it is obvious that on-site customer use is not the purpose of the antennas," and that "Indian Peak does not appear to engage in any activities on the site other than hosting the antenna array."[2] (Order Denying Mot. for Prelim. Inj. at 2, *Indian Peak Props., LLC v. City of Rancho Palos Verdes*, No. 20-cv-457 (C.D. Cal. Jul.

---

[2] This Court can take judicial notice of the Central District of California's opinion. *See Dupree v. Jefferson*, 666 F.2d 606, 608 n.1 (D.C. Cir. 1981). In addition, the City provided the Commission with Indian Peak's district court complaint, and quoted portions of the court's injunction opinion in an FCC filing. *See* May 2022 City Letter Ex. H (JA___).

15, 2020) (ECF No. 56).) Indian Peak then voluntarily dismissed its lawsuit without prejudice.

### C.    Indian Peak Seeks FCC Relief.

In April 2020, Indian Peak filed a petition for declaratory ruling with the FCC under 47 C.F.R. § 1.4000, asking the Commission to hold that the City's abatement efforts violated the Rule. *See Order* ¶ 25 (JA___). The FCC's Wireless Telecommunications Bureau dismissed the petition on April 22, 2022, finding that Indian Peak had not provided sufficient information to show that its antennas qualified for protection under the Rule. On May 1, Indian Peak filed five new petitions (the "Petitions")—each concerning a separate, specific antenna. *Order* ¶ 6 (JA___). Over the next few weeks, Indian Peak and the City filed a series of letters in which they detailed their prior litigation history, responded to one another's positions, and argued over the application of the Rule. (JA___–___.) In a supplement to its Petitions, Indian Peak stated for the first time that no one lived at the Property. May 2022 Supplement at 3 (JA___). In another supplement, Indian Peak described the Property as a "communications center with offices[.]" July Request at 2 (JA___).

In June 2022, Indian Peak filed a petition for writ of mandamus asking this Court to require the Commission to "take action on Indian's Petitions," or "issue a letter to Indian acknowledging receipt of Indian's Petitions . . . and declaring that a 'proceeding' was initiated . . . ." (Pet'n for Writ of Mandamus at 3, *In re Indian Peak Props., LLC*, No. 22-1098 (D.C. Cir. Jun. 3, 2022 ), ECF No. 1949651.)

On July 18, 2022, the Wireless Telecommunications and Media Bureaus dismissed the Petitions without prejudice, without opening a proceeding or putting the Petitions out for public comment. The Bureaus found that "the purposes and uses of the majority of the antennas, which are critical to the applicability of the [R]ule, remain[] unclear," that Indian Peak had not "identif[ied] any non-communications-service-provider user who regularly resides at or uses the premises," and that it was "not clear whether Antennas 2–4 are serving end users at the premises, as required for a dispute to implicate the OTARD [R]ule." Letter from Garnet Hanley, Wireless Telecommunications Bureau and Maria Mullarkey, Media Bureau to Toneata Martocchio (the "Bureau Dismissal") at 2, 6, 5 (Jul. 18, 2022) (JA___, ___, ___). Indian Peak sought reconsideration, which the Bureaus denied on December 13. Letter from

Garnet Hanley, Wireless Telecommunications Bureau and Maria Mullarkey, Media Bureau to Julian Gehman at 2 (Dec. 13, 2022) (JA___). While its reconsideration petition was still pending, Indian Peak took down its antennas. Notice of Antenna Removal (JA___).

### D. The *Order* Under Review.

When the Bureaus denied its petition for reconsideration, Indian Peak applied to the full Commission to review the Bureaus' ruling on three of its five Petitions. Appl. for Review of Indian Peak Props., LLC (Jan. 12, 2023) (JA___). Among its arguments, it alleged various procedural and due process errors stemming from the Bureaus' failure to solicit public comment on its Petitions, but it told the Commission that "[p]lacing Indian's OTARD petitions on public notice at this late date would add nothing new. Indian's Petitions for Antennas 2, 3, and 4 are ripe for grant." *Id.* at 24 (JA___).

The City responded to Indian Peak's Application for Review. Letter from William W. Wydner (Feb. 6, 2023) (the "Feb. 2023 City Letter") (JA___). The City claimed "Indian Peak wants to turn this empty single family residence into a business space to commercially transmit wireless radio signals off the property," and argued it was "inconceivable" that the

Rule "was ever intended to allow a business to invade a predominantly residential community, purchase a single family home in an entirely residential neighborhood, leave the home vacant because of all the electrical equipment to be installed, and then blanket the roof of that home with 18 commercial antenna[s]." Feb. 2023 City Letter at 3, 2 (JA___, ___). In a reply, Indian Peak claimed that it "has provided Wi-Fi and hard-wired Internet access as an amenity to its invitees," and reiterated that "[t]here is no need for further public notice. Indian's Petitions are ripe for grant." Reply of Indian Peak Props. at 3, 4 (JA___).

The Commission dismissed in part and denied in part the Application for Review. It began by analyzing the history of its OTARD Rule, noting that over numerous revisions, it had "never altered the basic requirement that the rule benefit a human antenna user," *Order* ¶ 20 (JA___), and concluded that "[f]or OTARD protections to attach to a fixed wireless antenna, the petitioner must demonstrate that it is regularly being used to provide signals to human end users at the location where the equipment is installed." *Id.* ¶ 23 (JA___).

Applying this standard, the Commission could not "discern" from Indian Peak's "vague and evolving characterization about the extent of

use" whether "any customer on the premises was served." *Id.* ¶ 23 (JA___). Specifically, Indian Peak "failed to provide sufficient clarity regarding the frequency, duration, or consistency with which any persons are on site," and its "allegations of a human presence at the antenna site" were "vague to the point that we are unable to conclude that human users are on site to more than a *de minimis* extent." *Id.* ¶ 24 (JA___). The Commission noted that Indian Peak had no residential tenants, that it described the Property as "exclusively" a "communications center," and that, while Indian Peak claimed "'vendors and contractors' of an unspecified nature 'regularly' visit the property and use the Internet for unidentified purposes," it failed to "clearly state that its tenants' personnel have ever worked at the house and if so, how frequently they were at the property." *Id.* ¶ 28 (JA___). At the same time, the Commission emphasized Indian Peak's numerous statements suggesting that one of its primary uses of fixed wireless service was to enable *remote* access to the Property. *Id.* ¶¶ 24, 27–28 (JA___, ___).

The Commission rejected as either moot or meritless Indian Peak's arguments concerning the Bureau's failure to put its Petitions out for public comment. First, noting that "Indian Peak claims no purpose would

be served in the initiation of a proceeding at this point," the Commission held that, "[b]ecause we conclude that the antennas are not protected by the OTARD rules, the question of whether the Petitions should have been placed on public notice is moot." *Order* ¶ 32 (JA___).

Next, the Commission rejected Indian Peak's arguments that it had a constitutional due process right to have the petitions placed on public notice, because the argument had not been raised before the Bureaus. *Id.* ¶ 33 & n.101 (citing 47 C.F.R. § 1.115(c)) (JA___). The Commission also found the argument moot because, again, it had concluded on the merits that Indian Peak was not entitled to relief under the Rule, and (as Indian Peak admitted) no purpose would be served by initiating a proceeding. *Id.* ¶ 33 (JA___). Finally, in the alternative, the Commission denied the argument on the merits. *Id.* ¶ 33–36 (JA___–___).

## STANDARD OF REVIEW

Under the Administrative Procedure Act's ("APA") arbitrary-and-capricious standard, this Court "presumes the validity of agency action" and "must affirm unless the Commission failed to consider relevant factors or made a clear error in judgment[.]" *Cellco P'ship v. FCC*, 357 F.3d 88, 93–94 (D.C. Cir. 2004). The Court will not disturb an agency's factual findings when they are supported by substantial evidence. *Archer*

*W. Contractors, LLC v. U.S. Dep't of Transp.*, 45 F.4th 1, 6 (D.C. Cir. 2022). The Court reviews constitutional challenges to agency action *de novo. Nat'l Lifeline Ass'n v. FCC*, 983 F.3d 498, 507 (D.C. Cir. 2020).

## SUMMARY OF THE ARGUMENT

**I.** The Commission correctly construed the Rule to require a regular human presence at an antenna's location. This requirement is evident from the Rule's text and the Commission's historic treatment of the Rule, and is consistent with Congress's original purpose of protecting viewers' access to video programming. Likewise, the Commission's determination that Indian Peak failed to adequately alleged that its antenna use fell within the Rule's scope was supported by substantial evidence: Indian Peak repeatedly told the Commission that no one lived at the Property, emphasized the importance of remote access, and offered vague and inconsistent descriptions of how the Property was used.

**II.** The Bureaus properly dismissed Indian Peak's Petitions without initiating a proceeding. Insofar as Indian Peak argues the *Bureaus* violated FCC regulations, the Commission did not decide that question, so there is no final reviewable agency action on that point. Instead, the Commission correctly held that the question was moot. Moreover, Indian

Peak waived any claim to a proceeding when it told the Commission that public comment was unnecessary.

The Commission also afforded Indian Peak due process. Both the City and Indian Peak had extensive opportunity to be heard, and the Commission did not deprive Indian Peak of any legally protected interest. Indeed, its antennas stayed up until after the Bureaus ruled on its Petitions. Nor did Indian Peak have a reasonable reliance interest in having the Commission interfere in ongoing litigation when Indian Peak failed to adequately invoke the Rule.

**III.** The Commission was not required to submit the human-presence requirement for notice-and-comment rulemaking. Indian Peak failed to preserve this argument because it did not raise it below. The argument also lacks merit because the *Order* was decided in an adjudication, and it is settled law that in adjudications, agencies can interpret their rules without submitting them for public comment.

## ARGUMENT

### I.   THE *ORDER* WAS LAWFUL.

The Commission properly construed the Rule to apply only where an actual human is regularly present to use an antenna, and its finding

that Indian Peak failed to properly invoke the Rule was well supported by substantial evidence.

## A. The Commission Correctly Held That the Rule Requires a Regular Human Presence at an Antenna's Location.

From its origins as a protection of *viewers'* access to satellite video *at their homes*, the Rule has always contemplated that a protected antenna serve a human end user at the antenna's location. Indeed, if the Rule did *not* contain a human-presence requirement, it would necessarily extend to antennas on unoccupied buildings—a result which nothing in the Rule's history supports.

**a.** Starting with its text, the Rule applies only to antennas located on "property within the exclusive use or control of the antenna user[.]" 47 C.F.R. § 1.4000(a)(1). Additionally, the Rule defines fixed-wireless signals—the kind of signals Indian Peak's antennas provided— as "signals transmitted . . . to and/or from a fixed *customer location*." *Id.* § 1.4000(a)(2) (emphasis added). Thus, a covered antenna must: (i) have a "user," (ii) be located on property within that user's "use or control," and (iii) deliver service to or from its customer's location. It is not enough to deliver service to a customer or be located on a customer's building; an antenna must *both* be located on property the customer controls *and*

deliver service to its customer's location. The most natural reading of these combined requirements is that they refer to an antenna installed on, and providing service to, property where a human end-user is regularly physically present to use that service. The Bureaus recognized this too, when they said it was "not clear whether Antennas 2–4 are serving end users at the premises, as required for a dispute to implicate the OTARD [R]ule." Bureau Dismissal at 5 (JA___).

Indian Peak's argument that "'customer' also refers to a business," and that "the Rule was directed toward business customers, as well as residences," (Br. 35, 36) misses the mark. The point of the human-presence requirement is not that the Rule only applies to human *customers*, but that it applies only where a human—whether it be a resident, an employee, or a business invitee—is present to *use* the service an antenna provides. A business can be a customer under the Rule, but that does not mean it can put an antenna on an empty building and claim the Rule's protection from valid zoning laws.

The Rule's history reinforces the correctness of the Commission's interpretation. When it first enacted the Rule, the Commission indicated that it would "ensure that *consumers* have access to a broad range of

video programming[.]" *1996 Order*, 11 FCC Rcd at 19,281, ¶ 6 (emphasis added). And although the regulation itself has always referred to an antenna's "user," the explanatory language in the order promulgating the regulation used the term "viewer" in its place. *See, e.g.*, *id.* at 19,284–85, ¶¶ 13–14. Thus, when the Rule was first announced, both Congress and the Commission understood that it benefitted *consumers* and *viewers*— words that refer to human beings.

Although the Commission has subsequently expanded the Rule beyond video services—so that it no longer makes sense to refer to "viewers"—it has always made clear that the Rule's basic contours remain intact. In 2000, the Commission stressed that the Rule applied "only . . . to antennas placed *at a customer location* for the purpose of providing fixed wireless service . . . to one or more customers *at that location.*" *2000 Order*, 15 FCC Rcd at 23,028, ¶ 99 (emphasis added). In 2004, it emphasized that "equipment *must be installed in order to serve the customer on such premises*[.]" *2004 Order*, 19 FCC Rcd at 5644, ¶ 17 (emphasis in original). And in 2021, it underscored that the Rule only applies to antennas that "serve[] a customer *on whose premises [they are] located.*" *2021 Order*, 36 FCC Rcd at 540, ¶ 9 (emphasis added). *See also,*

*e.g.*, *2000 Order*, 15 FCC Rcd at 23,028, ¶ 100 ("[T]he restrictions we adopt today are limited by the express[] limitations of Section 1.4000."); *2004 Order*, 19 FCC Rcd at 5644, ¶ 17 (noting that equipment still "must comply with all of the limitations of the [R]rule"); *2021 Order*, 36 FCC Rcd at 540, ¶ 19 ("[O]ur revision is narrow in scope and . . . we maintain the other existing OTARD restrictions.").

Finally, even if the human-presence requirement were not clear form the Rule's text, the Commission's construction should still be upheld because it reflects the agency's official position, reached after "'fair and considered judgment,'" in an area within the Commission's substantive experience. *Kisor v. Wilkie*, 588 U.S. 558, 578–79 (2019); *Nat'l Lifeline Ass'n*, 983 F.3d at 511 (finding *Kisor* applicable where Congress "explicitly entrusted the Commission with [rules'] implementation and oversight").[3] Nor was the Commission's interpretation a *post-hoc*

---

[3] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) held that courts may not defer to agency interpretations of ambiguous *statutes*, but did not overrule *Kisor*, which concerns agencies' interpretations of their own regulations. Indeed, *Loper Bright* repeatedly and affirmatively cites *Kisor*. 144 S. Ct. at 2261, 2262, 2267, 2268. Unsurprisingly, "other circuits have concluded that *Loper Bright[]* . . . does not impact the deference afforded to agencies interpreting their own regulations." *Battineni v. Mayorkas*, No. 22-
(continued…)

rationalization adopted in litigation: The Commission was not litigating against Indian Peak when it decided the *Order*, it was adjudicating claims Indian Peak *asked it* to decide.

**b.** Indian Peak's reliance on the Commission's decision in *Continental Airlines*, 21 FCC Rcd 13,201 (2006), is misplaced, because that decision addressed an unrelated issue. In *Continental*, the Commission found that the Rule protected a Wi-Fi router an airline had installed in an airport lounge. 21 FCC Rcd 13,201, 13,204, ¶ 9. When *Continental* was decided, the Rule still excluded antennas that functioned *primarily* as a hub or relay, and the airport argued that the airline's router fell outside the scope of the Rule because it "was installed primarily as a hub to serve" "passengers rather than as a customer-end antenna intended to serve" the airline itself. *Id.* at 13,210, ¶ 21. The Commission rejected this argument, holding that the Rule applies "even if invitees on the premises, such as houseguests or business customers, receive the signals, because the invitees are presumably present at the

---

1332 (PLF), --- F. Supp. 3d ---, 2024 WL 4367522, n.3 (D.D.C. Oct. 2, 2024) (collecting cases).

antenna user's invitation and for the antenna user's own purposes." *Id.* at 13,210, ¶ 21.

But whether an antenna primarily serves a company versus its invitees is entirely distinct from whether there is a regular human presence at the antenna's location. As the Commission explained below, "[t]here was no question" in *Continental* "that there was a regular and continuous human presence and that a purpose of the service provided by the antennas was to serve those human users." *Order* ¶ 30 (JA___). Thus, while the Commission considered the *airline* the "user" for purposes of the Rule, there was no doubt that it had a regular human presence at the router's location—both through its passenger invitees and its own employees. *See Continental*, 21 FCC Rcd at 13,204–05, ¶ 9.

In contrast, even if Indian Peak's business tenants were "present" in the sense that they kept equipment at the Property and had a right to enter, there was insufficient evidence of *regular* on-site *human* activity. On the contrary, as discussed below, Indian Peak made clear that it had no residential tenants, described its employees' and vendors' use of the site in vague and inconclusive terms, and emphasized that its antennas supported "remote monitoring or control by offsite personnel—a function

that specifically does not require a human presence on the property." *Id.* (JA___). That scenario is wholly unrelated to the facts of *Continental*.

## B. Substantial Evidence Supports the Commission's Ruling.

The evidence strongly supports the Commission's finding that Indian Peak inadequately alleged that its antenna use implicated the Rule. "[W]hen an agency acts pursuant to congressionally-delegated authority and the action has the force of law, the agency itself is typically owed deference with respect to its fact-finding[.]'" *Indian River Cnty., Fla. v. U.S. Dep't of Transp.*, 945 F.3d 515, 527 (D.C. Cir. 2019). Indian Peak described its Property as a house where "no one" lived and which served "exclusively" as a "communications center" with extensive remote monitoring and operation capabilities. *See Order* ¶¶ 28, 30 (JA___); May 2022 Supplement at 3 (JA___). The only human activity Indian Peak described was "regular[]" visits of unspecified duration or frequency by unspecified "vendors and contractors" for unspecified purposes, plus the generic representation that its tenants "have employees who access the Property[.]" *Id.* ¶ 28 n.89 (JA___). Moreover, the Commission found Indian Peak's "representations regarding the facts" "unclear and inconsistent[.]" *Id.* ¶ 29 (JA___). On this record, the FCC reasonably was

unable to conclude that there was regular human activity sufficient to trigger the Rule's protections.

Indian Peak argues that in applying the human-presence requirement, the Commission shifted the burden away from the City. (*See* Br. 32–33.) This is wrong. To be sure, the Rule places the ultimate burden on the party *enforcing* a restriction to prove that its restriction does *not* "impair" qualifying antenna use. 47 C.F.R. § 1.4000(g). But the Commission did not require Indian Peak to prove that the City's enforcement effort was invalid. Rather, it required Indian Peak to allege sufficient facts about how the property was used—something Indian Peak is in the best position to know—so that the Commission could determine if the dispute fell within the Rule's ambit in the first place.

Finally, Indian Peak claims that the *Order* was arbitrary and capricious because it was the product of biased factfinding. (Br. 41.) One alleged example of bias—that the Commission held it to an unannounced new standard (Br. 41)—simply repackages Indian Peak's unconvincing arguments against the human-presence requirement and fails for the same reasons. And its argument that the Commission "fail[ed] to acknowledge that income property can have multiple uses" overlooks the record: Although Indian Peak *now* claims that its Property has

"simultaneously" generated rental income "as a residence and . . . as a communications site," (Br. 42), it told the Commission that "no one" lived at the Property, which it described as "exclusively a communications center." July Request at 2 (JA___). Indian Peak cannot fault the Commission for not acknowledging a fact asserted for the first time on review.

## II. THE COMMISSION CORRECTLY REJECTED INDIAN PEAK'S ARGUMENTS THAT THE BUREAUS' FAILURE TO INITIATE A PROCEEDING WAS IMPROPER.

Indian Peak argues that it was entitled to have the Bureaus "shield[]" it from litigation with the City by initiating a proceeding and submitting its Petitions for public comment. (*E.g.*, Br. 44.) Because the Bureaus failed to do so, Indian Peak alleges it incurred attorney's fees and lost the use of its antennas. (*See* Br. 26, 44.) In addition to directly arguing that the Bureaus violated the Commission's rules (Br. 23), Indian Peak maintains that the Bureaus' failure to initiate a proceeding violated its reliance interests (Br. 27), and that the Commission ultimately denied it due process by depriving it of the use of its antennas (Br. 44). To the extent these arguments are preserved, they are unavailing.

### A. The Bureaus Reasonably Dismissed Indian Peak's Petitions Without Initiating a Proceeding.

**a.** To start, Indian Peak's argument that the Bureaus violated the Rule is not properly before the Court. This Court reviews only final actions of the Commission, not staff-level decisions. *See* 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a); *NTCH, Inc. v. FCC*, 877 F.3d 408, 414 (D.C. Cir. 2017). *See also Indian Peak Props. LLC v. FCC*, No. 23-1223, 2023 WL 8494465, at *1 (D.C. Cir. Dec. 7, 2023) (per curiam) (dismissing Indian Peak's petition for review of the Bureaus' rulings because "[t]he challenged orders are not final"). The Commission did not rule on Indian Peak's argument that the Bureaus were required to initiate a proceeding, instead finding the issue moot because Indian Peak conceded further proceedings would serve no purpose, and because the Commission found that Indian Peak was not entitled to relief on the merits. *Order* ¶ 32 (JA___).

That ruling was correct: A question is moot when it "cannot affect the rights of litigants" in a case, *In re Grand Jury Subpoena*, 912 F.3d 623, 634 (D.C. Cir. 2019) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)), and given the Commission's determination that Indian Peak's Petitions failed on the merits, allowing public comment could not have

affected the ultimate disposition of Indian Peak's Petitions. Furthermore, Indian Peak waived any claim of entitlement to having a proceeding initiated when it told the Commission that "[t]here is no need for further public notice," and described its Petitions as "ripe for grant." Reply of Indian Peak at 4 (JA___); App. for Rev. at 22 (JA___); *Order* ¶ 32 & n.98 (JA___). If Indian Peak believed the existing record was sufficient to grant its Petitions, and urged the FCC to act promptly on that belief, it cannot now be heard to complain that the Commission should have done something different.

Because there was no final agency decision on whether the Bureaus were required to initiate a proceeding, and because Indian Peak asked the Commission to grant its Application for Review without further proceedings, its argument that the Bureaus should have opened a proceeding is not preserved.

**b.** In this Court, Indian Peak reads the Rule to "remove[] from FCC staff even the discretion to weed out a frivolous petition." (Br. 16.) Indian Peak distills this surprising proposition from the fact the Rule says petitions "will be put on public notice," and states that an unsuccessful petitioner has 21 days to remove its antennas and cannot

be fined or penalized until that period expires, *unless* its opponent "demonstrates, in the same proceeding . . . that the [petitioner's] claim in the proceeding was frivolous." 47 C.F.R. § 1.4000(e), 1.4000(a)(4). But a general statement that petitions "will" be put on public notice—or the fact that a rule provides consequences for a petition that is determined to be frivolous at a later stage—cannot obligate an agency to entertain a petition that fails at the outset to state a plausible claim under the Rule. "Agencies are not . . . helpless slaves to literalism," and the Communications Act authorizes the Commission to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." *Waterkeeper Alliance v. EPA*, 853 F.3d 527, 535 (D.C. Cir. 2017); 47 U.S.C. § 154(j).

Consistent with this notion, the Bureaus explained that they have previously dismissed OTARD petitions without first initiating a proceeding when it was unclear a dispute fell within the Rule in the first place. *See* Bureau Dismissal at 8 n.53 (JA___) (citing *Pet'n for Decl. Ruling—Multifamily Broadband Council*, Letter Order, 32 FCC Rcd 3794, 3795–96 (MB 2017)). They appropriately did so here. *See* Reconsideration Denial at 5 (JA___) ("Particularly where, as here, the

initiation of a proceeding immediately alters the parties' legal rights by staying local government action . . . the decision not to initiate a proceeding to solicit responsive pleadings on a defective petition is well within the Commission's discretion to 'conduct its proceedings as will best conduce to the proper dispatch of business and the ends of justice.'" (quoting 47 U.S.C. § 154(j)).

### B. The Commission Did Not Violate Indian Peak's Due Process Rights or Reliance Interests.

To the extent Indian Peak argues that the procedure followed below violated its constitutional rights or reliance interests, those arguments are also forfeited. FCC regulations state that "[n]o application for review will be granted if it relies on questions of fact or law upon which the designated authority has been afforded no opportunity to pass." 47 C.F.R. § 1.115(c). The Commission found that both of Indian Peak's arguments were improper because Indian Peak did not raise them before the Bureaus—a finding Indian Peak does not address on review. *Order* ¶¶ 34, 35 (JA___, ___). Apart from their being forfeited, Indian Peak's arguments are wrong.

a. Due process requires notice and an opportunity to be heard. *Zevallos v. Obama*, 793 F.3d 106, 116 (D.C. Cir. 2015). Indian Peak

received both. Indian Peak and the City—the only evident parties in interest—had actual notice of Indian Peak's Petitions, each made numerous submissions laying out its positions both to the Bureaus and the Commission, and the FCC denied the Petitions based on the record Indian Peak made.

Relying on the Supreme Court's decision in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972), Indian Peak argues that it had a constitutional interest in "hav[ing] its petitions placed on public notice and shielded from litigation." (Br. 44.) But *Roth* dealt with a person's property interest in continuing to receive "specific benefits" he or she already receives, *see* 408 U.S. at 576—such as welfare benefits or continued employment—not an entitlement to have an agency follow a specific procedure in carrying out agency business. This Court has held that an agency's "failure to follow the applicable rules is relevant to a due process claim *only if the agency's action deprives the plaintiff of . . . property*." *Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1533 (D.C. Cir. 1983) (en banc) (emphasis in original). A party "must allege more than the deprivation of the *expectation* that the agency will carry out its duties[.]" *Id.* at 1534 (emphasis in original).

Otherwise, if "such an expectation was protected under the Constitution, this court would be swamped with constitutional claims because every agency deviation from the statutory norm would raise constitutional questions." *Id.*

The requirement that a party must be deprived of property to mount a due process claim forecloses Indian Peak's position here. While Indian Peak complains that the Commission should have placed its Petitions on public notice, thereby initiating a proceeding, the failure to do so did not deprive Indian Peak of the use of its antennas. It was not the *Commission* but the *City*—with the imprimatur of the California courts and all the due process they afforded—that led Indian Peak to remove its antennas. *See Order* ¶ 34 n.104 (JA___). The Commission correctly rejected Indian Peak's Petitions, and that action did not result in a constitutional injury to Indian Peak.[4]

---

[4] Indian Peak also claims that the Commission denied it due process by not providing an unbiased tribunal. (Br. 45.) It is unclear how this is different from the argument, addressed above, that the *Order* was arbitrary and capricious because the Commission was biased. (Br. 41.) The only case Indian Peak cites in support of its *constitutional* bias claim is *Cinderella Career and Finishing Schools, Inc. v. FTC*, 425 F.2d 583 (D.C. Cir. 1970). *Cinderella* involved a Commissioner of the Federal Trade Commission who made public remarks about policy
(continued...)

**b.**     Nor did Indian Peak have a legitimate "reliance interest" in being "shielded from enforcement" by the Commission without the viability of its Petitions being scrutinized first. (Br. 29.) It is unclear how the Commission could have "shielded" Indian Peak from enforcement efforts that the City initiated *before* Indian Peak filed its first petition, and Indian Peak does not cite a single example of the Commission halting ongoing litigation upon receiving an OTARD petition that fails to state a claim.[5] Of course, the Rule requires the proponent of a restriction to "suspend all enforcement efforts" if the Commission opens a proceeding, and prohibits attorney's fees or "other penalties" from accruing while the proceeding is open, 47 C.F.R § 1.4000(a)(4). But there was no proceeding; the Commission reasonably dismissed Indian Peak's petitions, as we

---

matters related to a case currently before the Commission, which this Court held mandated his recusal. 425 F.2d at 589–92. That scenario has nothing to do with anything that happened here.

[5]     In *Victor Frankfurt, Vernon Hills, Illinois*, 12 FCC Rcd 17,631 (CSB 1997) the Cable Services Bureau asked a court to hold a parallel proceeding in abeyance while the Commission resolved an OTARD petition. 12 FCC Rcd at 17,636, ¶¶ 13–14. (*See* Br. 35.) But nothing suggested the *Victor Frankfurt* petition failed to state a claim on its face, and the decision in *Victor Frankfurt* suggests that the litigation continued in court notwithstanding the Commission's request that it be stayed.

have shown. In any event, the City did *not* remove Indian Peak's antennas while its Petitions were being considered; Indian Peak removed them *after* the Bureaus ruled but before the Commission decided Indian Peak's Application for Review.[6]

Indian Peak complains that the Bureaus "did not inform" it "that there was no 'proceeding'" for more than "two years after" it filed a petition. (Br. 47.) But this refers to the Bureaus' consideration of Indian Peak's *2020 petition*, which is not on review here. Indian Peak filed the Petitions that the *Order* resolved in May 2022, and the Bureaus dismissed them that July. Any delay deciding the *earlier* petition is not before this Court. Similarly, while Indian Peak says it incurred large attorney's fees or penalties in its litigation with the City, it fails to distinguish the period when its Petitions were pending from the earlier period that is outside the scope of its Petition for Review, and at any rate, the Commission found Indian Peak had provided insufficient evidence in support of its claimed financial injury. *See Order* ¶ 33 & n.100 (JA___).

---

[6] Indian Peak argues (Br. 26), that it was denied the 21-day grace period the Rule provides for unsuccessful petitioners, but nothing in the record suggests that the City would have required Indian Peak to remove the antennas in less time than the Rule allows.

## III. INDIAN PEAK'S NOTICE-AND-COMMENT ARGUMENT IS UNPRESERVED AND WITHOUT MERIT.

Even if the human-presence requirement were a "new rule" as Indian Peak maintains (Br. 34), Indian Peak failed to preserve its notice-and-comment challenge because it did not raise it with the Commission. Further, the *Order* was straightforwardly an adjudication and thus not subject to the APA's notice-and-comment procedures.

### A. Indian Peak Failed to Preserve its Notice-and-Comment Challenge.

Indian Peak never argued before the Commission, as it does now (Br. 39), that the *Order* announced a new rule or flouted the APA. Section 405(a) of the Communications Act requires "[t]he filing of a petition for reconsideration" where "the party seeking . . . review . . . relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass." 47 U.S.C. § 405(a). "[E]ven when a petitioner has no reason to raise an argument until the FCC issues an order that makes the issue relevant, the petitioner must file a petition for reconsideration with the Commission before it may seek judicial review." *In re Core Communications, Inc.*, 455 F.3d 267, 276–77 (D.C. Cir. 2006).

This Court has "strictly construed § 405(a), and [has] made it clear that [it] will not review arguments that have not first been presented to

the Commission." *Nat'l Lifeline Ass'n*, 983 F.3d at 509 (quotation marks omitted). *See also, e.g.*, *Globalstar, Inc. v. FCC*, 564 F.3d 476, 483–84 (D.C. Cir. 2009) (finding petitioner's "inadequate notice claim" "barred by § 405(a)"); *Cassell v. FCC*, 154 F.3d 478, 485 (D.C. Cir. 1998) (finding argument that "the FCC effectively adopted a substantive rule" without notice and comment was barred under § 405(a)). Because Indian Peak did not file a petition for reconsideration or otherwise alert the Commission to the *Order*'s alleged defects, its notice-and-comment claims are not properly before the Court.

## B. The Commission Was Not Required to Submit the *Order* to Notice-and-Comment Rulemaking.

The Commission's gloss on the Rule as requiring a human presence was not subject to notice-and-comment requirements because it was announced in an adjudication—that is, a "case-specific determination[] that immediately bind[s] parties by retroactively applying law to their past actions." *Electric Energy, Inc. v. EPA*, 106 F.4th 31, 45 (D.C. Cir. 2024) (quotation marks omitted). As this Court has "repeatedly held, adjudicatory decisions are not subject to the APA's notice-and-comment requirements." *Blanca Tel. Co. v. FCC*, 743 F.3d 860, 867 (D.C. Cir. 2014). Nor is an agency "precluded from announcing new principles in an

adjudicative proceeding." *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974)); *see also Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017) ("Statutory interpretation can be rendered in the form of an adjudication, not only in a rulemaking." (quotation marks omitted)). On the contrary, "[a]djudicating a specific controversy requires identifying the governing law, which may involve resolving disputes about what that law means." *ITServe*, 71 F.4th at 1035.

Indian Peak argues that an agency cannot evade notice-and-comment requirements by using an adjudication to *amend* a legislative rule. (Br. 39.) This is true enough, but the *Order* did not amend the Rule; it interpreted it in light of the specific facts of Indian Peak's Petitions. *See generally ITServe*, 71 F.4th at 1031–36 (rejecting argument that agency engaged in rulemaking where, in an adjudication, it "interpreted pre-existing law," "applied that law" to the case before it, and "set forth

the agency's view of what the . . . regulation had meant from the date of its enactment"). Notice and comment were thus not required.[7]

---

[7] Given Indian Peak's extensive submissions to the Bureaus and the Commission, it is not plausible that there remained any argument Indian Peak was prevented from making before the Commission ruled. *See generally* 5 U.S.C. § 706 (in reviewing agency action under the APA, "due account shall be taken of the rule of prejudicial error"); *United States Telecom Ass'n v. FCC*, 825 F.3d 674, 726 (D.C. Cir. 2016) ("A deficiency of notice is harmless if the challengers . . . cannot show prejudice in the form of arguments they would have presented to the agency if given a chance.").

## CONCLUSION

The Court should deny the petition for review.

October 18, 2024

Respectfully submitted,

/s/ *John R. Grimm*

P. Michele Ellison
  *General Counsel*

Jacob M. Lewis
  *Deputy General Counsel*

Sarah E. Citrin
  *Deputy Associate General Counsel*

Jonathan S. Kanter
  *Assistant Attorney General*

John R. Grimm
  *Counsel*

Robert B. Nicholson
Matthew A. Waring
  *Attorneys*

FEDERAL COMMUNICATIONS
  COMMISSION
45 L Street NE

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Ave. NW
Washington, DC 20530

Washington, DC 20554
(202) 418-1740
fcclitigation@fcc.gov

*Counsel for Respondent*
  *United States of America*[8]

*Counsel for Respondent Federal*
  *Communications Commission*

---

[8] Filed with consent pursuant to D.C. Circuit Rule 32(a)(2).

# CERTIFICATE OF COMPLIANCE

Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements and Type Style Requirements

1.  This document complies with the type-volume limit of Fed. R. App.
    P. 32(a)(7)(B) because, excluding the parts of the document
    exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1):

    ☒   this document contains <u>8,303</u> words, *or*

    ☐   this document uses a monospaced typeface and contains ____
        lines of text.

2.  This document complies with the typeface requirements of Fed. R.
    App. P. 32(a)(5) and the type style requirements of Fed. R. App. P.
    32(a)(6) because:

    ☒   this document has been prepared in a proportionally spaced
        typeface using <u>Microsoft Word for Office 365</u> in <u>14-point</u>
        <u>Century Schoolbook</u>, *or*

    ☐   this document has been prepared in a monospaced spaced
        typeface using _____ with _____.

                        */s/ John R. Grimm*
                        John R. Grimm
                        *Counsel for Respondents*

**CERTIFICATE OF FILING AND SERVICE**

I, John R. Grimm, hereby certify that on October 18, 2024, I filed the foregoing Brief for Respondents with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the electronic CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ John R. Grimm*

John R. Grimm
   *Counsel*

Federal Communications
Commission
Washington, D.C. 20554
(202) 418-1740

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM CONTENTS

**Page**

Pub. L. 104–104, 110 Stat. 56 ......................................................... Add. 1

5 U.S.C. § 706 ................................................................................. Add. 2

28 U.S.C. § 2342 ............................................................................. Add. 4

47 U.S.C. § 402 ............................................................................... Add. 6

47 U.S.C. § 405 ............................................................................... Add. 8

47 C.F.R. § 1.4000 ........................................................................ Add. 10

\* \* \*

## SEC. 207. RESTRICTIONS ON OVER–THE–AIR RECEPTION DEVICES.

Within 180 days after the date of enactment of this Act, the Commission shall, pursuant to section 303 of the Communications Act of 1934, promulgate regulations to prohibit restrictions that impair a viewer's ability to receive video programming services through devices designed for over-the-air reception of television broadcast signals, multichannel multipoint distribution service, or direct broadcast satellite services.

\* \* \*

# 5 U.S.C. § 706

## Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

# 28 U.S.C. § 2342

## § 2342. Jurisdiction of court of appeals

The court of appeals (other than the United States Court of Appeals for the Federal Circuit) has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

**(1)** all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47;

**(2)** all final orders of the Secretary of Agriculture made under chapters 9 and 20A of title 7, except orders issued under sections 210(e), 217a, and 499g(a) of title 7;

**(3)** all rules, regulations, or final orders of—

**(A)** the Secretary of Transportation issued pursuant to section 50501, 50502, 56101-56104, or 57109 of title 46 or pursuant to part B or C of subtitle IV, subchapter III of chapter 311, chapter 313, or chapter 315 of title 49; and

**(B)** the Federal Maritime Commission issued pursuant to section 305, 41304, 41308, or 41309 or chapter 421 or 441 of title 46;

**(4)** all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42;

**(5)** all rules, regulations, or final orders of the Surface Transportation Board made reviewable by section 2321 of this title;

**(6)** all final orders under section 812 of the Fair Housing Act; and

**(7)** all final agency actions described in section 20114(c) of title 49.

Jurisdiction is invoked by filing a petition as provided by section 2344 of this title.

# 47 U.S.C. § 402

## § 402. Judicial review of Commission's orders and decisions

### (a) Procedure

Any proceeding to enjoin, set aside, annul, or suspend any order of the Commission under this chapter (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28.

### (b) Right to appeal

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

**(1)** By any applicant for a construction permit or station license, whose application is denied by the Commission.

**(2)** By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

**(3)** By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

**(4)** By any applicant for the permit required by section 325 of this title whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

**(5)** By the holder of any construction permit or station license which has been modified or revoked by the Commission.

**(6)** By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) of this subsection.

**(7)** By any person upon whom an order to cease and desist has been served under section 312 of this title.

**(8)** By any radio operator whose license has been suspended by the Commission.

**(9)** By any applicant for authority to provide interLATA services under section 271 of this title whose application is denied by the Commission.

**(10)** By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 618(a)(3) of this title.

\* \* \*

# 47 U.S.C. § 405

Petition for reconsideration; procedure; disposition; time of filing;
additional evidence; time for disposition of petition for reconsideration
of order concluding hearing or investigation; appeal of order

**(a)** After an order, decision, report, or action has been made or taken in
any proceeding by the Commission, or by any designated authority
within the Commission pursuant to a delegation under section 155(c)(1)
of this title, any party thereto, or any other person aggrieved or whose
interests are adversely affected thereby, may petition for reconsideration
only to the authority making or taking the order, decision, report, or
action; and it shall be lawful for such authority, whether it be the
Commission or other authority designated under section 155(c)(1) of this
title, in its discretion, to grant such a reconsideration if sufficient reason
therefor be made to appear. A petition for reconsideration must be filed
within thirty days from the date upon which public notice is given of the
order, decision, report, or action complained of. No such application shall
excuse any person from complying with or obeying any order, decision,
report, or action of the Commission, or operate in any manner to stay or
postpone the enforcement thereof, without the special order of the
Commission. The filing of a petition for reconsideration shall not be a
condition precedent to judicial review of any such order, decision, report,
or action, except where the party seeking such review (1) was not a party
to the proceedings resulting in such order, decision, report, or action, or
(2) relies on questions of fact or law upon which the Commission, or
designated authority within the Commission, has been afforded no
opportunity to pass. The Commission, or designated authority within the
Commission, shall enter an order, with a concise statement of the reasons
therefor, denying a petition for reconsideration or granting such petition,
in whole or in part, and ordering such further proceedings as may be
appropriate: *Provided,* That in any case where such petition relates to an
instrument of authorization granted without a hearing, the Commission,
or designated authority within the Commission, shall take such action
within ninety days of the filing of such petition. Reconsiderations shall
be governed by such general rules as the Commission may establish,

except that no evidence other than newly discovered evidence, evidence which has become available only since the original taking of evidence, or evidence which the Commission or designated authority within the Commission believes should have been taken in the original proceeding shall be taken on any reconsideration. The time within which a petition for review must be filed in a proceeding to which section 402(a) of this title applies, or within which an appeal must be taken under section 402(b) of this title in any case, shall be computed from the date upon which the Commission gives public notice of the order, decision, report, or action complained of.

**(b)(1)** Within 90 days after receiving a petition for reconsideration of an order concluding a hearing under section 204(a) of this title or concluding an investigation under section 208(b) of this title, the Commission shall issue an order granting or denying such petition.

**(2)** Any order issued under paragraph (1) shall be a final order and may be appealed under section 402(a) of this title.

# 47 C.F.R. § 1.4000

## Restrictions impairing reception of television broadcast signals, direct broadcast satellite services or multichannel multipoint distribution services.

(a)(1) Any restriction, including but not limited to any state or local law or regulation, including zoning, land-use, or building regulations, or any private covenant, contract provision, lease provision, homeowners' association rule or similar restriction, on property within the exclusive use or control of the antenna user where the user has a direct or indirect ownership or leasehold interest in the property that impairs the installation, maintenance, or use of:

  (i) An antenna that is:

    (A) Used to receive direct broadcast satellite service, including direct-to-home satellite service, or to receive or transmit fixed wireless signals via satellite, including a hub or relay antenna used to receive or transmit fixed wireless services that are not classified as telecommunications services, and

    (B) One meter or less in diameter or is located in Alaska;

  (ii) An antenna that is:

    (A) Used to receive video programming services via multipoint distribution services, including multichannel multipoint distribution services, instructional television fixed services, and local multipoint distribution services, or to receive or transmit fixed wireless signals other than via satellite, including a hub or relay antenna used to receive or transmit fixed wireless services that are not classified as telecommunications services, and

(B) That is one meter or less in diameter or diagonal measurement;

(iii) An antenna that is used to receive television broadcast signals; or

(iv) A mast supporting an antenna described in paragraphs (a)(1)(i), (a)(1)(ii), or (a)(1)(iii) of this section; is prohibited to the extent it so impairs, subject to paragraph (b) of this section.

(2) For purposes of this section, "fixed wireless signals" means any commercial non-broadcast communications signals transmitted via wireless technology to and/or from a fixed customer location. Fixed wireless signals do not include, among other things, AM radio, FM radio, amateur ("HAM") radio, CB radio, and Digital Audio Radio Service (DARS) signals.

(3) For purposes of this section, a law, regulation, or restriction impairs installation, maintenance, or use of an antenna if it:

(i) Unreasonably delays or prevents installation, maintenance, or use;

(ii) Unreasonably increases the cost of installation, maintenance, or use; or

(iii) Precludes reception or transmission of an acceptable quality signal.

(4) Any fee or cost imposed on a user by a rule, law, regulation or restriction must be reasonable in light of the cost of the equipment or services and the rule, law, regulation or restriction's treatment of comparable devices. No civil, criminal, administrative, or other legal action of any kind shall be taken to enforce any restriction or regulation prohibited by this section except pursuant to paragraph (d) or (e) of this section. In addition, except with respect to restrictions pertaining to safety and historic preservation as described in

paragraph (b) of this section, if a proceeding is initiated pursuant to paragraph (d) or (e) of this section, the entity seeking to enforce the antenna restrictions in question must suspend all enforcement efforts pending completion of review. No attorney's fees shall be collected or assessed and no fine or other penalties shall accrue against an antenna user while a proceeding is pending to determine the validity of any restriction. If a ruling is issued adverse to a user, the user shall be granted at least a 21–day grace period in which to comply with the adverse ruling; and neither a fine nor a penalty may be collected from the user if the user complies with the adverse ruling during this grace period, unless the proponent of the restriction demonstrates, in the same proceeding which resulted in the adverse ruling, that the user's claim in the proceeding was frivolous.

(5) For purposes of this section, "hub or relay antenna" means any antenna that is used to receive or transmit fixed wireless signals for the distribution of fixed wireless services to multiple customer locations as long as the antenna serves a customer on whose premises it is located, but excludes any hub or relay antenna that is used to provide any telecommunications services or services that are provided on a commingled basis with telecommunications services.

(b) Any restriction otherwise prohibited by paragraph (a) of this section is permitted if:

(1) It is necessary to accomplish a clearly defined, legitimate safety objective that is either stated in the text, preamble, or legislative history of the restriction or described as applying to that restriction in a document that is readily available to antenna users, and would be applied to the extent practicable in a non-discriminatory manner to other appurtenances, devices, or fixtures that are comparable in size and weight and pose a similar or greater safety risk as these antennas and to which local regulation would normally apply; or

(2) It is necessary to preserve a prehistoric or historic district, site, building, structure or object included in, or eligible for inclusion on, the National Register of Historic Places, as set forth in the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470, and imposes no greater restrictions on antennas covered by this rule than are imposed on the installation, maintenance, or use of other modern appurtenances, devices, or fixtures that are comparable in size, weight, and appearance to these antennas; and

(3) It is no more burdensome to affected antenna users than is necessary to achieve the objectives described in paragraphs (b)(1) or (b)(2) of this section.

(c) [Reserved by 85 FR 18146]

(d) Local governments or associations may apply to the Commission for a waiver of this section under § 1.3 of this chapter. Waiver requests must comply with the procedures in paragraphs (f) and (h) of this section and will be put on public notice. The Commission may grant a waiver upon a showing by the applicant of local concerns of a highly specialized or unusual nature. No petition for waiver shall be considered unless it specifies the restriction at issue. Waivers granted in accordance with this section shall not apply to restrictions amended or enacted after the waiver is granted. Any responsive pleadings must be served on all parties and filed within 30 days after release of a public notice that such petition has been filed. Any replies must be filed within 15 days thereafter.

(e) Parties may petition the Commission for a declaratory ruling under § 1.2 of this chapter, or a court of competent jurisdiction, to determine whether a particular restriction is permissible or prohibited under this section. Petitions to the Commission must comply with the procedures in paragraphs (f) and (h) of this section and will be put on public notice. Any responsive pleadings in a Commission proceeding must be served on all parties and filed within 30 days after release of a public notice that such

petition has been filed. Any replies in a Commission proceeding must be served on all parties and filed within 15 days thereafter.

(f) Copies of petitions for declaratory rulings and waivers must be served on interested parties, including parties against whom the petitioner seeks to enforce the restriction or parties whose restrictions the petitioner seeks to prohibit. A certificate of service stating on whom the petition was served must be filed with the petition. In addition, in a Commission proceeding brought by an association or a local government, constructive notice of the proceeding must be given to members of the association or to the citizens under the local government's jurisdiction. In a court proceeding brought by an association, an association must give constructive notice of the proceeding to its members. Where constructive notice is required, the petitioner or plaintiff must file with the Commission or the court overseeing the proceeding a copy of the constructive notice with a statement explaining where the notice was placed and why such placement was reasonable.

(g) In any proceeding regarding the scope or interpretation of any provision of this section, the burden of demonstrating that a particular governmental or nongovernmental restriction complies with this section and does not impair the installation, maintenance, or use of devices used for over-the-air reception of video programming services or devices used to receive or transmit fixed wireless signals shall be on the party that seeks to impose or maintain the restriction.

(h) All allegations of fact contained in petitions and related pleadings before the Commission must be supported by affidavit of a person or persons with actual knowledge thereof. An original and two copies of all petitions and pleadings should be addressed to the Secretary at the FCC's main office, located at the address indicated in 47 CFR 0.401(a). Copies of the petitions and related pleadings will be available for public inspection through the Reference Information Center.